Christopher W. Wood (SBN 193955)
**DREYER BABICH BUCCOLA
WOOD CAMPORA, LLP**
20 Bicentennial Circle
Sacramento, California 95826
Telephone: (916) 379-3500
Facsimile: (916) 379-3599
*cwood@dbbwc.com*

Todd M. Friedman (SBN 216752)
**LAW OFFICES OF TODD M. FRIEDMAN, P.C.**
21550 Oxnard Street, Suite 780
Woodland Hills, California 91367
Telephone: (877) 619-8966
Facsimile: (866) 633-0028
*tfriedman@toddflaw.com*

John P. Kristensen (SBN 224132)
**KRISTENSEN LLP**
12450 Beatrice Street, Suite 200
Los Angeles, California 90066
Telephone: (310) 507-7924
Facsimile: (310) 507-7906
*john@kristensenlaw.com*

*Attorneys for Plaintiffs and all others
similarly situated*

### THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF CALIFORNIA – SACRAMENTO DIVISION

| | |
|---|---|
| MICHAEL HELLMAN, individually on behalf of himself and all others similarly situated; FRANCISCO BERLANGA, individually on behalf of himself and all others similarly situated; TIM ARTOFF, individually on behalf of himself and all others similarly situated; CY MITCHELL, individually on behalf of himself and all others similarly situated; and JONATHAN LOLLAR, individually on behalf of himself and all others similarly situated,<br><br>          Plaintiffs,<br><br>     v.<br><br>POLARIS INDUSTRIES, INC., a Delaware corporation; POLARIS | Case No.:<br><br>**<u>CLASS ACTION</u>**<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR:**<br><br>**(1) Violation of the California Consumer Legal Remedies Act;**<br>**(2) Violation of the California Unfair Competition Law;**<br>**(3) Violation of California False Advertising Law;**<br>**(4) Violation of the Oregon Unlawful Trade Practices Act;**<br>**(5) Violation of the Nevada Deceptive Trade Practices Act; and**<br>**(6) Violation of the Texas Deceptive Trade Practices Act.** |

1    SALES, INC., a Minnesota        ) **<u>DEMAND FOR JURY TRIAL</u>**
2    corporation; POLARIS INDUSTRIES, )
     INC., a Minnesota corporation; and )
3    DOES 1 through 10, inclusive,     ) **DECLARATION OF MICHAEL**
                                       ) **HELLMAN**
4                Defendants.           )
                                       )
5    _____   )

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

**PLAINTIFFS' COMPLAINT** ........................................................................... **1**

**I.**   **NATURE OF THE ACTION** ........................................................ **1**

**II.**   **UTVs SOLD BY POLARIS** ....................................................... **5**

**III.**   **JURISDICTION AND VENUE** ................................................... **7**

**IV.**   **PARTIES** ................................................................................... **7**

**V.**   **FACTUAL ALLEGATIONS** ......................................................... **9**

    **A.** *The Government Considers Regulations for UTVs* ................................. **9**

    **B.** *The 1970s OSHA Regulation for ROPS on Farm Tractors* ................. **10**

    **C.** *ROHVA, a Polaris-Controlled Entity, Adopts the*
    *29 C.F.R. § 1928.53 Test* ..................................................... **11**

    **D.** *Polaris Cheats and None of the Class Vehicles Passes the 29*
    *C.F.R. § 1928.53 Test* ........................................................ **11**

    **E.** *Polaris Cheats by Improperly Distributing the Load and None of*
    *the Class Vehicles Pass the 29 C.F.R. 1928.53 Side Load Test* .......... **13**

    **F.** *Plaintiffs' Transactions* ........................................................ **14**

**VI.**   **CLASS ALLEGATIONS** .......................................................... **19**

**VII.**   **CAUSES OF ACTION** ............................................................ **25**

    **FIRST CAUSE OF ACTION**
    **Violation of California Consumer Legal Remedies Act**
    **By Plaintiffs Michael Hellman, Francisco Berlanga, and the**
    **California Class Against All Defendants** .................................... **25**

    **SECOND CAUSE OF ACTION**
    **Violation of California Unfair Competition Law**
    **By Plaintiffs Michael Hellman, Francisco Berlanga, and the**
    **California Class Against All Defendants** .................................... **29**

THIRD CAUSE OF ACTION
**Violation of the California False Advertising Law**
**By Plaintiffs Michael Hellman, Francisco Berlanga, and the**
**California Class Against All Defendants**..................................................... 34

FOURTH CAUSE OF ACTION
**Violation of the Oregon Unlawful Trade Practices Act**
**By Plaintiff Tim Artoff and the Oregon Class**
**Against All Defendants**............................................................................... 38

FIFTH CAUSE OF ACTION
**Violation of the Nevada Deceptive Trade Practices Act**
**By Plaintiff Cy Mitchell and the Nevada Class**
**Against All Defendants**............................................................................... 41

SIXTH CAUSE OF ACTION
**Violation of the Texas Deceptive Trade Practices Act**
**By Plaintiff Jonathan Lollar and the Texas Class**
**Against All Defendants**............................................................................... 44

**PRAYER FOR RELIEF** ....................................................................... 47

**DECLARATION OF MICHAEL HELLMAN** ................................. 50

1    Plaintiffs MICHAEL HELLMAN, FRANCISCO BERLANGA, TIM

2    ARTOFF, CY MITCHELL, and JONATHAN LOLLAR (collectively,

3    "Plaintiffs"), individually and on behalf of all others similarly situated, allege the

4    following upon information and belief, based upon investigation of counsel,

5    published reports, and personal knowledge:

6    **I.    NATURE OF THE ACTION**

7        1.    Plaintiffs bring this action against defendants POLARIS

8    INDUSTRIES, INC. (the Delaware corporation), POLARIS SALES, INC.,

9    POLARIS INDUSTRIES, INC. (the Minnesota corporation and parent

10   corporation of the other two Polaris defendants) (collectively, "Defendants" or

11   "Polaris") on behalf of all persons who purchased in California in the four years

12   preceding this Complaint, in Oregon in the four years preceding this Complaint,

13   in Nevada in the four years preceding this Complaint, in Texas in the four years

14   preceding this Complaint, Polaris Utility Terrain Vehicles ("UTVs") (they are

15   also called side-by-sides) that Polaris claimed/advertised/marked/certified that the

16   vehicles' rollover protection system ("ROPS") complied with the department of

17   Occupational Safety and Health Administration ("OSHA")

18   requirements/standards of 29 C.F.R. § 1928.53 (which is for agricultural tractors).

19       2.    "Class Vehicles" is defined to include, but are not limited to the

20   following models: Polaris RZR XP 4 Turbo S; Polaris RZR XP 4 Turbo EPS,

21   Polaris RZR PRO XP Ultimate, Polaris RZR XP Turbo S; Polaris RZR XP Turbo

22   EPS; Polaris RZR XP 4 1000 High Lifter; Polaris RZR XP 4 Turbo S Velocity;

23   Polaris RZR PRO XP Premium; Polaris RZR XP 4 1000 Premium; Polaris RZR

24   XP 4 Turbo; Polaris RZR XP 4 Turbo Dynamix Edition; Polaris RZR XP 4 Turbo

25   Fox Edition; Polaris RZR XP 1000 Trails & Rocks; Polaris RZR PRO XP; Polaris

26   XP Turbo S Velocity; Polaris RZR XP 4 1000 Limited Edition; Polaris RZR XP 4

27   1000 EPS; Polaris RZR XP 4 1000 Ride Command; Polaris RZR XP 1000 EPS

28   High Lifter; Polaris RZR XP 1000 High Lifter; Polaris RZR XP 1000 EPS;

Polaris RZR XP 1000 EPS LE; Polaris RZR XP 1000 Ride Command; Polaris RZR XP 4 1000; Polaris RZR XP Turbo; Polaris RZR XP Turbo Fox Edition; Polaris RZR XP Turbo Dynamix Edition; Polaris RZR XP Turbo S; Polaris RZR XP 1000 Premium; Polaris RZR 4 1000; Polaris RZR XP 1000 Limited Edition; Polaris RZR XP 1000; Polaris RZR S 1000; Polaris RZR S 1000 EPS; Polaris RZR S 900 Premium; Polaris RZR 900 Fox Edition; Polaris RZR S 900; Polaris RZR S 900 EPS; Polaris RZR S4 900 EPS; Polaris RZR 900 Premium; Polaris RZR RS1; Polaris RZR 900; Polaris RZR 4 900 EPS LE; Polaris RZR 4 900 EPS; Polaris RZR 900 EPS Trail; Polaris RZR 900 EPS; Polaris RZR 900 EPS XC Edition; Polaris RZR 900 Polaris; Polaris RZR 4 800 EPS LE; Polaris RZR 4 800 EPS; Polaris RZR S 800 EPS; Polaris RZR S 800 LE; Polaris RZR S 800; Polaris RZR 800 EPS LE; Polaris RZR 800 EPS XC Edition; Polaris RZR 800 Polaris Pursuit; Polaris RZR 800; Polaris RZR 570 Premium; Polaris RZR 570 EPS Trail LE; Polaris RZR 570 EPS Trail; Polaris RZR 570 EPS LE; Polaris RZR 570 EPS; Polaris RZR 570; Polaris RZR S 570 570 EPS; Polaris RZR 170 EFI; Polaris RZR Turbo EPS; Polaris Ranger Crew XP 1000 EPS NorthStar Edition; Polaris Ranger XP 1000 NorthStar Edition; Polaris Ranger Crew XP 1000 EPS NorthStar HVAC Edition; Polaris Ranger XP 1000 EPS NorthStar HVAC Edition ; Polaris Ranger XP 1000 EPS NorthStar Edition; Polaris Ranger Crew XP 1000 High Lifter Edition; Polaris Ranger XP 1000 High Lifter Edition; Polaris Ranger Crew XP 1000 EPS High Lifter Edition; Polaris Ranger XP 1000 EPS High Lifter Edition; Polaris Ranger Crew XP 1000 EPS Back Country Edition; Polaris Ranger XP 1000 EPS Back Country Limited Edition; Polaris Ranger Crew XP 1000 EPS 20th Anniversary Limited Edition; Polaris Ranger XP 1000 EPS 20th Anniversary Limited Edition; Polaris Ranger Crew XP 1000 Texas Edition; Polaris Ranger XP 1000 Texas Edition; Polaris Ranger Crew XP 1000 Premium; Polaris Ranger Crew XP 1000 EPS Premium; Polaris Ranger XP 1000 Premium; Polaris Ranger Crew XP 1000 EPS; Polaris Ranger XP 1000 EPS; Polaris Ranger XP 1000 EPS

Ranch Edition; Polaris Ranger XP 1000 EPS Hunter Edition; Polaris Ranger XP 1000; Polaris Ranger Crew XP 900 EPS; Polaris Ranger XP 900 EPS; Polaris Ranger XP 900 EPS Premium; Polaris Ranger Crew XP 900; Polaris Ranger XP 900; Polaris Ranger Crew XP 900-6 EPS; Polaris Ranger Crew XP 900-6; Polaris Ranger Crew XP 900-5 EPS; Polaris Ranger Crew XO 900-5; Polaris Ranger XP 900; Polaris Ranger XP 900 EPS; Polaris Ranger XP 900 EPS High Lifter Edition; Polaris Ranger XP 900 EPS Hunter Deluxe Edition; Polaris Ranger XP 900 EPS Hunter Edition; Polaris Ranger XP 900 EPS NorthStar Edition; Polaris Ranger XP 900 EPS Trail Edition; Polaris Ranger XP 900 EPS LE; Polaris Ranger XP 900 EPS Browning LE; Polaris Ranger XP 900 Deluxe; Polaris Ranger XP 570 EPS; Polaris Ranger XP 570; Polaris Ranger Crew 1000 Premium; Polaris Ranger 1000 Premium; Polaris Ranger Crew 1000; Polaris Ranger 1000 EPS; Polaris Ranger 1000; Polaris Ranger Crew 900 EPS; Polaris Ranger Crew 900 EPS LE; Polaris Ranger Crew 900; Polaris Ranger Crew 900-6 EPS; Polaris Ranger Crew 900-6; Polaris Ranger 800 EFI; Polaris Ranger 800 Midsize; Polaris Ranger 800 EPS LE; Polaris Ranger Crew 800 EPS; Polaris Ranger Crew 800; Polaris Ranger 800 EPS; Polaris Ranger Crew 570-6; Polaris Ranger Crew 570-4 Premium; Polaris Ranger Crew 570-4 EPS; Polaris Ranger Crew 570-4; Polaris Ranger Crew 570 EPS; Polaris Ranger Crew 570 EPS LE; Polaris Ranger Crew EPS 570 Full-Size; Polaris Ranger 570 EPS; Polaris Ranger 570 EPS Hunter Edition; Polaris Ranger Crew 570 EFI; Polaris Ranger 570 EFI; Polaris Ranger Crew 570 Full-Size; Polaris Ranger 570 Full-Size; Polaris Ranger Crew 570; Polaris Ranger 570; Polaris Ranger 500; Polaris Ranger 400; Polaris Ranger 150 EFI; Polaris Ranger 6X6; Polaris Ranger Diesel HST Deluxe; Polaris Ranger Diesel HST; Polaris Ranger Crew Diesel; Polaris Ranger Diesel; Polaris Ranger EV; Polaris Ranger EV LI-ION; Polaris Ranger ETX; Polaris General 4 1000 EPS Deluxe; Polaris General 4 1000; Polaris General 4 1000 EPS; Polaris General 4 1000 Ride Command Edition; Polaris General 1000 Deluxe; Polaris

General 1000 Premium; Polaris General 1000; Polaris General 1000 Ride Command Edition; Polaris General 1000 Hunter Edition; Polaris General 1000 Limited Edition; Polaris General 1000 EPS; Polaris General 1000 EPS Deluxe; Polaris General 1000 EPS Hunter Edition; and Polaris General 1000 EPS Ride Command Edition.

3.     Polaris includes stickers like the following to suggest that their vehicles meet these OSHA requirements:



4.     The stickers are placed on Class Vehicles and are visible at the point of sale where consumers are also informed that Class Vehicles meet all applicable standards and regulations, including self-adopted regulations, and meet OSHA requirements of 29 C.F.R. § 1928.53, when in fact, they do not.

5.     None of the Class Vehicles sold by Polaris meet the OSHA requirements of 29 C.F.R. § 1928.53. Polaris tells all of their customers that their ROPS are safe because they meet this standard. They do not. Polaris has also staved off federal regulations by the U.S. Consumer Product Safety Commission ("CPSC") in part by causing the adoption of newly created industry standards as part of the self-regulation revolution. Even after adopting farm tractor standards issued for worker safety on farms in the early 1970s, Polaris cheats and does not even meet those standards.

6.     Roof strength is a vital safety concern to consumers given the strong likelihood of UTVs rolling over. The failure to meet all applicable federal and state statutes, standards, regulations, and self-adopted regulations, including OSHA 29 C.F.R. § 1928.53 requirements is material information for consumers purchasing/leasing UTVs, such as the Class Vehicles.

7.     While many violations are described below with specificity, this Complaint alleges violations of the statutes cited in their entirety.

8.      Unless otherwise stated, Plaintiffs allege that any violations by Polaris were knowing and intentional, and that Polaris did not maintain procedures reasonably adapted to avoid any such violation.

9.      Unless otherwise indicated, the use of any defendant's name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers of that defendant's name.

## II.    UTVS SOLD BY POLARIS

10.     A UTV is a motorized vehicle with four or more low pressure tires designed for off-road use and intended by the manufacturer primarily for recreational use by one or more persons. UTVs are a relatively new product in the motorized off-road category, and their speed and design make them unique from all-terrain vehicles ("ATVs"). The main distinction is that an ATV is defined by federal law, in part as: any motorized, off-highway vehicle designed to travel on 3 or 4 wheels, having a seat designed to be straddled by the operator and handlebars for steering control. 15 U.S.C. § 2089(e)(1)(A).

11.     A UTV, unlike an ATV, has traditional seating like an automobile with bench or bucket seats, a restraint system, and is equipped with a steering wheel. UTVs are similar in design to golf carts with throttle and brake pedals. While golf carts travel approximately 15 miles per hour or less, UTVs such as the Polaris Rangers and Razors have top speeds well in excess of 60 miles per hour. Polaris UTVs are powered by strong engines with up to 181 horsepower.

///

///

///

///

///

///

12. The images depicted below are from Polaris' most recent earnings report and website. They show the Rangers and Razors, which do not look like slow 1970s farm tractors:

 



13. UTVs were introduced into the United States market in the late 1990s. In 1998, only 2,000 UTVs were sold, all by one manufacturer. Polaris entered the market in 2000. By 2003, 20,000 UTVs were sold in the United States. That number then grew dramatically. There was a 19% growth from calendar year 2006 over 2005 levels with approximately 255,000 UTVs sold worldwide. In its most recent second quarter of 2019 earnings report, Polaris estimated nearly 1

1  billion in gross sales in the quarter. Polaris possesses the top spot in the North

2  American market share ranks and has a three -fold lead on its nearest competitor.

3      14.    Polaris UTVs are sold at retail with an approximate median base

4  price of around $12,999.99 and sell at prices exceeding $20,000.00. The price is

5  similar to entry and midsize automobiles.

6  **III.**    <u>**JURISDICTION AND VENUE**</u>

7      15.    Jurisdiction is proper under 28 U.S.C. § 1332(d)(2) because plaintiff

8  Michael Hellman purchased his 2018 Polaris RZR in Tehama County in the State

9  of California, and Plaintiffs seek relief on behalf of a California Class, an Oregon

10  Class, a Nevada Class and a Texas Class. Defendants' principal place of business

11  is located in Minnesota. In addition, the matter in controversy exceeds $5,000,000

12  exclusive of interest and costs. Therefore, both diversity jurisdiction and the

13  damages threshold under the Class Action Fairness Act of 2005 ("CAFA") are

14  present, and this Court has jurisdiction.

15      16.    Venue is proper pursuant to 28 U.S.C. § 1391 for the following

16  reasons: (i) the conduct complained of herein occurred within this judicial district;

17  and (ii)) Defendants conducted business within this judicial district at all times

18  relevant.

19      17.    Because Defendants conducted business within the State of

20  California at all time relevant, personal jurisdiction is established.

21  **IV.**    <u>**PARTIES**</u>

22      18.    Plaintiff Michael Hellman ("Hellman") is an individual who resides

23  in the State of California. Plaintiff is a member of the putative California Class

24  defined herein.

25      19.    Plaintiff Francisco Berlanga ("Berlanga") is an individual who

26  resides in the State of California. Plaintiff is a member of the putative California

27  Class defined herein.

28  ///

20.     Plaintiff Tim Artoff ("Artoff") is an individual who resides in the State of Oregon. Plaintiff is a member of the putative Oregon Class defined herein.

21.     Plaintiff Cy Mitchell ("Mitchell") is an individual who resides in the State of Nevada. Plaintiff is a member of the putative Nevada Class defined herein.

22.     Plaintiff Jonathan Lollar ("Lollar") is an individual who resides in the State of Texas. Plaintiff is a member of the putative Texas Class defined herein.

23.     Plaintiffs are informed and believe, and upon such information and belief allege thereon, that defendant Polaris Industries, Inc. is a Delaware Corporation with its principal place of business at 2100 Highway 55, Medina, Minnesota 55340-9770. Its agent for service of process is The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801.

24.     Plaintiffs are informed and believe, and upon such information and belief allege thereon, that defendant Polaris Sales, Inc. is a Minnesota Corporation with its principal place of business at 2100 Highway 55, Medina, Minnesota 55340-9770. Its agent for service of process in California is CT Corporation System located at 818 West 7th Street, Suite 930, Los Angeles, California 90017.

25.     Plaintiffs are informed and believe, and upon such information and belief allege thereon, that defendant Polaris Industries, Inc. is a Minnesota Corporation with its principal place of business at 2100 Highway 55, Medina, Minnesota 55340-9770. It is the parent company of both defendant Polaris Industries, Inc. the Delaware Corporation and Polaris Sales, Inc. Its agent for service of process is CT Corporation System Inc., 101 Date Street N., St. Paul, Minnesota 55117-5603.

26.     Polaris maintains their largest and distribution center facility in California. Polaris at all relevant times herein sold vehicles to members of the general public as well as designing, testing, manufacturing, inspecting,

distributing, recalling them, and warning and instructing users on the safe use of the motor vehicles, including the subject vehicles, in exchange for valuable consideration in Tehama County.

27.    The above-named Defendants, and their subsidiaries and agents, are collectively referred to as "Defendants." The true names and capacities of the Defendants sued herein as Doe Defendants 1 through 10, inclusive, are currently unknown to Plaintiffs, who therefore sue such Defendants by fictitious names. Each of the Defendants designated herein as a Doe is legally responsible for the unlawful acts alleged herein. Plaintiffs will seek leave of Court to amend the Complaint to reflect the true names and capacities of the Doe Defendants when such identities become known.

28.    Plaintiffs are informed and believe, and thereon allege, that at all relevant times, each and every Defendant was acting as an agent and/or employee of each of the other Defendants, and was the owner, agent, servant, joint venturer and employee, each of the other and each was acting within the course and scope of its ownership, agency, service, joint venture and employment with the full knowledge and consent of each of the other Defendants. Plaintiffs are informed and believe, and based thereon allege, that each of the acts and/or omissions complained of herein was made known to, and ratified by, each of the other Defendants.

29.    At all times mentioned herein, each and every Defendant was the successor of the other and each assumes the responsibility for each other's acts and omissions.

## V.    FACTUAL ALLEGATIONS

### A.    *The Government Considers Regulations for UTVs*

30.    Polaris UTVs are subject to product safety standards administered by the CPSC, not the National Highway Traffic Safety Administration ("NHTSA"). UTVs are "consumer products" that can be regulated by the CPSC via the

Consumer Product Safety Act. 15 U.S.C. § 2052(a).

31.     On December 12, 2008, the CPSC met with representatives of the Recreational Off-Highway Vehicle Association ("ROVHA") to discuss the development of a standard to be certified by the American National Standards Institute ("ANSI"). The standards discussed, at this time, involved stability standards. In June 2009, ROHVA sent over proposed voluntary standards, including one for the ROPS. Ken D'Entremont and Mary McConnell attended the meeting for Polaris. Paul Vitrano attended for ROHVA.

32.     In 2009, the CPSC began the process of considering regulatory action of UTVs. (In CPSC nomenclature they are ROVs.) It issued a Notice of Proposed Rulemaking. The CPSC noted that farm vehicles have maximum speeds of 25 mph or less, while UTVs at the time could exceed 30 mph. The CPSC identified its databases of Injury and Potential Injury Incidents (IPII) and In-Depth Investigation (INDP) for incidents between January 2003 and August 2009 involving 181 incidents, including 116 fatalities and 152 other injuries. The injuries included deglovings, fractures and crushing injuries to victims' legs, feet, arms and hands, resulting in amputations at times. 69% of the injuries occurred in rollover incidents.

33.     By April 2013, the CPSC was aware of 428 incidents resulting in 231 fatalities and 388 other injuries. 150 of the 231 deaths were in rollover accidents.

**B.     *The 1970s OSHA Regulation for ROPS on Farm Tractors***

34.     In 1972, the U.S. Department of Labor concerned that "[t]ractor roll-overs have been a major cause of employee injury and death on the farm" appointed the Standards Advisory Committee on Agriculture to make a ROPS standard a priority.

35.     After the notice of proposed rulemaking notice period, the Department of Labor, via OSHA promulgated 29 C.F.R. §§ 1928.51 (definitions), 1928.52 and 1928.53 (ROPS strength test).

36.    The test for the ROPS strength involves forces applied to the ROPS and it measures the deflection caused by the force. If there is too much deflection the ROPS fails the tests. How much force is applied, according to the regulation depends on the tractor weight.

37.    Tractor weight is defined pursuant to 29 C.F.R. §§ 1928.51(a)(4) as:

> "Tractor weight" includes the protective frame or enclosure, all fuels, and other components required for normal use of the tractor. Ballast shall be added as necessary to achieve **a minimum total weight** of 110 lb. (50.0 kg.) per maximum power take-off horse power at the rated engine speed or the maximum, gross vehicle weight specified by the manufacturer, **whichever is the greatest**. From end weight shall be at least 25 percent of the tractor test weight. **In case power take-off horsepower is not available, 95 percent of net engine flywheel horsepower shall be used**.

38.    Thus, the weight to be tested is either the gross vehicle weight (about 2,000 to 2,400 pounds, or the 110 pounds multiplied by the maximum power take off horse power. The statute specifically indicates if the tractor is not one where you can measure the "power take off" horsepower, or PTO, then 95 percent of net engine flywheel horsepower is used.

**C.    ROHVA, a Polaris-Controlled Entity, Adopts the 29 C.F.R. § 1928.53 Test**

39.    In order to avoid CPSC promulgating actual regulations, Polaris and the industry set up new standards with which they would comport. One of these was for the strength of the ROPS. This was done via ROHVA, which is controlled, in part by Polaris. ROHVA adopted the tractor ROPS test of 29 C.F.R. §§ 1928.51, *et seq.*, This was then made into an ANSI standard.

**D.    Polaris Cheats and None of the Class Vehicles Passes the 29 C.F.R. § 1928.53 Test**

40.    The Class Vehicles consisting of 2015 to 2019 Polaris UTVs are believed to have horsepower ranging from approximately 168 horsepower to 68

horsepower for the smaller 2-door Rangers.

41.     For every model of Class Vehicles, Polaris tested the vehicles by the gross vehicle weight. Polaris intentionally refused to test at 110 pounds times either the maximum power take off horsepower or 95% of the net engine flywheel horsepower. For example, the 2019 RZR XP 4 Turbo is tested at 2750 pounds (the gross vehicle weight is 2713 pounds). It has 168 horsepower. 95% of 168 horsepower is 159.6. Rounding down, would be 159. So, 110 pounds multiplied by 159 is 17,490. The correct "W" or tractor weight in the test, should be 17,490 pounds. Polaris intentionally refused to use the correct tractor weight of approximately 17,490 pounds. Instead, it used 2,750 pounds. Polaris did not comply with the test. Polaris misled all Class members.

42.     The Polaris vehicles are lighter and have much stronger engines than farm tractors. Hence, their gross vehicle weights are comparatively lower, and 110 pounds times their PTO horsepower (or 95% of the net fly wheel horsepower) is going to be larger than that of the farm tractors.

43.     In fact, the gross vehicle weight, due the specifications of the Class Vehicles should never be used for the OSHA tests. 110 pounds times the PTO horsepower (or 95% of the net fly wheel horsepower) of each Class Vehicle is substantially greater than the gross vehicle weights.

44.     Not a single Class Vehicle has been tested using the proper Tractor Weight pursuant to 29 C.F.R. §§ 1928.51, *et seq.*, Polaris advertised and told the public that each and every Class Vehicle passed the OSHA 29 C.F.R. § 1928.53 test. None did.

45.     In failing to provide consumers accurate and truthful information about the true nature and characteristics of the Class Vehicles pertaining to compliance with all applicable federal and state statutes, standards, and regulations, including self-adopted regulations, specifically OSHA requirements of 29 C.F.R. § 1928.53, consumers are damaged based on the benefit of the

bargain, that they have to retrofit the Class Vehicles for adequate safety, and are faced with a strong likelihood of serious injury or death.

46.    Polaris is believed to have digital computer models of the ROPS system that can be inputted into commercially available computer aided engineering programs. They test the ROPS system via an outside entity and using the computer aided engineering systems. It would be easy to ascertain whether the ROPS system meet the tests by inputting the correct Tractor Weight instead of the lower gross vehicle weight.

**E.**    ***Polaris Cheats by Improperly Distributing the Load and None of the Class Vehicles Pass the 29 C.F.R. 1928.53 Side Load Test***

47.    The Class Vehicles' ROPS, being an integral part of each vehicle's enclosure, are required to conform with the "side load" test as described in 29 C.F.R. § 1928.53(d)(2)(iii)(F). In essence, the integrity of the structure is tested by applying force to one side of the vehicle. Specifically, the test requires that:

> When the protective-frame structures are an integral part of the enclosure, apply the side load according to Figure C-13, and record $L$ and $D$ simultaneously. Static side-load application shall be distributed uniformly on the frame over an area perpendicular to the direction of load application [...] **This side load shall be applied to the longitudinal side farthest from the point of rear-load application**.

29 C.F.R. § 1928.53(d)(2)(iii)(F).

///

///

///

///

///

///

///

1
2
3
4
5
6
7
8
9



FIGURE C-13 - SIDE LOAD APPLICATION.

10    48.    Polaris cheats when it performs the side load test. Instead of

11  following OSHA guidelines and applying force to a single side, Polaris uses a tool

12  commonly known as a "load distributor" during the test to distribute the load

13  parallel across the top of the enclosure to the other side of the vehicle. The "load

14  distributor" does as the name suggests and spreads out the applied force. By doing

15  so, force is applied to ***both*** sides of the enclosure and not the one side as required

16  by the OSHA standard.

17    49.    Polaris purposefully uses the load distributor for every side load test

18  to ensure that every Class Vehicle "passes" the test.

19    50.    In failing to provide consumers accurate and truthful information

20  about the true nature and characteristics of the Class Vehicles pertaining to

21  compliance with all applicable federal and state statutes, standards, and

22  regulations, including self-adopted regulations, specifically OSHA requirements

23  of 29 C.F.R. § 1928.53, consumers are damaged based on the benefit of the

24  bargain, that they have to retrofit the Class Vehicles for adequate safety, and are

25  faced with a strong likelihood of serious injury or death.

26    **F.**    *Plaintiffs' Transactions*

27    51.    On or around May 26, 2018, Hellman purchased a 2018 Polaris RZR

28  Turbo S in Tehama County, California.

1      52.    Hellman saw and read the label/sticker on the 2018 Polaris RZR XP

2   similar to the picture listed below:



8      53.    Based on Hellman's employment experience in the HVAC industry,

9   he understood that OSHA requirements were federal regulations pertaining to

10  safety. Hellman read the sticker on the 2018 Polaris RZR Turbo S and understood

11  the language to mean that the vehicle's ROPS structure met federal standards for

12  safety and that the vehicle was safe for use by him, his family, and friends.

13     54.    Hellman, in seeing and reading the sticker, relied on the language

14  contained therein to purchase the 2018 Polaris RZR Turbo S. If the sticker said

15  that the ROPS structure failed to meet OSHA requirements, he would not have

16  purchased the 2018 Polaris RZR Turbo S.

17     55.    Hellman bought a Cage WRX aftermarket ROPS after Polaris

18  recalled certain ROPS. Hellman became aware of how weak Polaris' cages were

19  and did not feel it provided the safety necessary to protect himself and his

20  passengers.

21     56.    In or around May 18, 2019, Berlanga purchased a 2018 Polaris RZR

22  570 EPS in California.

23     57.    Berlanga saw and read the label/stickers on the 2018 Polaris RZR

24  570 EPS as depicted below:

25  ///

26  ///

27  ///

28  ///



58.    Berlanga was originally going to purchase an ATV, not a UTV. However, based on the fact the 2018 Polaris RZR 570 EPS had a roll cage/ROPS structure and being informed that the ROPS met OSHA standards, Berlanga read the sticker on the 2018 Polaris RZR 570 EPS and understood the language to mean that the vehicle's ROPS structure met federal standards for safety and that the vehicle was safe for use by him, his family, and friends.

59.    Berlanga, in seeing and reading the sticker, relied on the language contained therein to purchase 2018 Polaris RZR 570 EPS. If the sticker said that the ROPS structure failed to meet OSHA requirements, he would not have purchased the 2018 Polaris RZR 570 EPS.

60.    In 2021, Artoff purchased a 2021 RZR Turbo S Velocity in Oregon.

61.    Artoff saw and read the label/sticker on the 2021 RZR Turbo S Velocity pictured below:



///

62. Based on Artoff's employment experience as a peace officer, he understood that OSHA requirements were federal regulations pertaining to safety. Artoff read the sticker on the 2021 RZR Turbo S Velocity and understood the language to mean that the vehicle's ROPS structure met federal standards for safety and that the vehicle was safe for use by him, his family, and friends.

63. Artoff, in seeing and reading the sticker, relied on the language contained therein to purchase the 2021 RZR Turbo S Velocity. If the sticker said that the ROPS structure failed to meet OSHA requirements, he would not have purchased the 2021 RZR Turbo S Velocity.

64. In 2019, Mitchell purchased a new 2019 RZR XP Turbo in Nevada.

65. Mitchell saw and read the label/sticker on the 2019 RZR XP Turbo similar to the picture listed below:



66. Mitchell understood that OSHA requirements were federal regulations pertaining to safety. Mitchell read the sticker on the 2019 RZR XP Turbo and understood the language to mean that the vehicle's ROPS structure met federal standards for safety and that the vehicle was safe for use by him, his family, and friends.

67. Mitchell, in seeing and reading the sticker, relied on the language contained therein to purchase the 2019 RZR XP Turbo. If the sticker said that the ROPS structure failed to meet OSHA requirements, he would not have purchased the 2019 RZR XP Turbo.

68. Mitchell had a roll over and the ROPS collapsed due to it being weak and unsafe for consumers.

69.     On or around December 19, 2021, Lollar purchased a 2021 Polaris RZR XP 4 Turbo in Texas.

70.     Lollar saw and read the label/sticker on the 2021 Polaris RZR XP 4 Turbo which contained the sticker at the time of sale as depicted below, suggesting that Polaris vehicles meet these OSHA requirements:



71.     Lollar read the sticker on the 2021 Polaris RZR XP 4 Turbo and understood the language to mean that the vehicle's ROPS structure met federal standards for safety and that the vehicle was safe for use by him, his family, and friends.

72.     Lollar, in seeing and reading the sticker, relied on the language contained therein to purchase the 2021 Polaris RZR XP 4 Turbo. If the sticker said that the ROPS structure failed to meet OSHA requirements, he would not have purchased the 2021 Polaris RZR XP 4 Turbo.

73.     The stickers placed on Plaintiffs' Polaris vehicles as well as Class Vehicles and are visible at the point of sale where consumers are also informed that Class Vehicles meet all applicable standards and regulations, including self-adopted regulations, and meet OSHA requirements of 29 C.F.R. § 1928.53, when in fact, they do not.

74.     None of the Class Vehicles sold by Polaris meet the OSHA requirements of 29 C.F.R. § 1928.53. Polaris tell all of their customers that their ROPS systems are safe because they meet this standard. They do not. **They do not test the with the proper engine power in determining the vehicle weight**.

75.     But for Defendants' misrepresentations, misleading and fraudulent statements, Plaintiffs would not have purchased the vehicles or would have paid substantially less for the vehicles than the purchase price of upwards of $20,000.00 each. Plaintiffs did not receive the benefit of the bargain.

76.     In failing to provide consumers accurate and truthful information about the true nature and characteristics of the Class Vehicles pertaining to compliance with all applicable federal and state statutes, standards, and regulations, including self-adopted regulations, specifically OSHA requirements of 29 C.F.R. § 1928.53, consumers are damaged based on the benefit of the bargain, that they have to retrofit the Class Vehicles for adequate safety, and are faced with a strong likelihood of serious injury or death.

## VI.    CLASS ALLEGATIONS

77.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure and/or other applicable law, on behalf of themselves and all others similarly situated, as members of the proposed classes, per their state defined as follows.

78.     California Class (Hellman and Berlanga): All persons in California that purchased a Class Vehicle in the four years preceding the filing of this Complaint.

79.     Oregon Class (Artoff): All persons in Oregon that purchased a Class Vehicle in the four years preceding the filing of this Complaint.

80.     Nevada Class (Mitchell): All persons in Oregon that purchased a Class Vehicle in the four years preceding the filing of this Complaint.

81.     Texas Class (Lollar): All persons in Texas that purchased a Class Vehicle in the four years preceding the filing of this Complaint.

82.     Excluded from the Classes are governmental entities, Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns. Also excluded from the Classes are any judges, justices or judicial officers presiding over this matter and the members of their immediate families and judicial staff.

///

83.    Plaintiffs do not know the exact number of persons in the Classes, but believe them to be in the several hundreds, if not thousands, making joinder of all these actions impracticable.

84.    The identity of the individual members is ascertainable through Defendants' and/or Defendants' agents' records or by public notice.

85.    There is a well-defined community of interest in the questions of law and fact involved affecting the members of the Classes.

86.    Plaintiffs will fairly and adequately protect the interest of the Classes.

87.    Plaintiffs retained counsel experienced in consumer class action litigation.

88.    Plaintiffs' claims are typical of the claims of the Classes, which all arise from the same operative facts involving Defendants' practices.

89.    A class action is a superior method for the fair and efficient adjudication of this controversy.

90.    Class-wide damages are essential to induce Defendants to comply with the federal and state laws alleged in the Complaint.

91.    Class members are unlikely to prosecute such claims on an individual basis since the individual damages are small. Management of these claims is likely to present significantly fewer difficulties than those presented in many class claims, e.g., securities fraud.

92.    Plaintiffs and the Classes seek injunctive relief against Defendants to preclude Defendants from advertising that the Class Vehicles comply with OSHA 29 C.F.R. § 1928.53 until they meet the tests using the correct Tractor Weight as defined in 29 C.F.R. § 1928.51(a)(4).

93.    On April 6, 2017 in *McGill v. Citibank, N.A.*, 2 Cal.5th 945 (2017), the California Supreme Court ruled that any contract that waives the statutory remedy of public injunctive relief under the Unfair Competition Law, False Advertising Law, and Consumers Legal Remedies Act is contrary to California

public policy and this unenforceable under California law. Plaintiffs and the Classes seek injunctive relief under the Unfair Competition Law, Cal. *Bus. & Prof. Code* §§ 17200, *et seq.* due to Defendants' violation of the False Advertising Law, Consumer Legal Remedies Act, Breach of Express Warranty, and Breach of Implied Warranty based on Defendants' unlawful, unfair, and fraudulent business practices and misleading advertisements that the Class Vehicles meet all applicable federal and state statutes, standards, regulations, including OSHA requirements of 29 C.F.R § 1928.53. Plaintiffs and the Classes seek to enjoin Defendants' illegal business practices of advertising and informing consumers that the Class Vehicles meet all applicable federal and state statutes, standards, regulations, including OSHA requirements of 29 C.F.R § 1928.53, when they in fact, do not.

94.    As such, Plaintiffs and the Classes seek public injunctive relief to prevent Defendants from continuing with their unlawful business acts and practices as alleged herein to ensure that Defendants do not continue to harm the general public by continuing to engage in the unlawful business acts and practices as alleged herein.

95.    Plaintiffs, individually, and on behalf of all California, Oregon, Nevada and Texas consumers, seek individual, representative, and public injunctive relief and any necessary order or judgments that will prevent Defendants from continuing with their unlawful business acts and practices as alleged herein.

96.    Defendants acted on grounds generally applicable to the Classes thereby making appropriate final declaratory relief with respect to the Classes as a whole.

97.    Members of the Classes are likely to be unaware of their rights.

98.    Plaintiffs contemplate providing notice to the putative class members by direct mail in the form of a postcard and via publication.

99.   Plaintiffs request certification of a hybrid class combining the elements of Fed. R. Civ. P. 23(b)(3) for monetary damages and Fed. R. Civ. P. 23(b)(2) for equitable relief.

100.   This action is properly maintainable as a class action. This action satisfies the numerosity, typicality, adequacy, predominance and superiority requirements for a class action.

101.   **Numerosity**:  The proposed Classes are so numerous that individual joinder of all members is impracticable. Due to the nature of the trade and commerce involved, Plaintiffs do not know the number of members in the Classes, but believe the Class members number in the thousands, if not more. Plaintiffs allege that the Classes may be ascertained by the records maintained by Defendants.

102.   Plaintiffs and members of the Classes were harmed by the acts of Defendants in at least the following ways:  violation of California's Consumers Legal Remedies Act, Cal. *Civ. Code* §§ 1770(a)(5), (a)(7), (a)(9), (a)(13), (a)(14) and (a)(19); violations of California's Unfair Competition Law and False Advertising Law; violations of the Oregon Unlawful Trade Practices Act, violations of the Nevada Deceptive Trade Practices Act; and violations of the Texas Deceptive Trade Practices Act.

103.   **Commonality**: There are questions of law and fact common to Plaintiffs and the Classes that predominate over any questions affecting only individual members of the Classes. These common questions of law and fact include, without limitation:

    i.    Whether Defendants failed to test the Class Vehicles using the correct Tractor Weight as defined by 29 C.F.R. § 1928.51(a)(4);

    ii.    Whether Defendants violated Cal. Civ. Code §§ 1770, *et seq.*;

    iii.    Whether Defendants' practices are "unfair" as defined by Cal. *Bus. & Prof. Code* §§ 17200, *et seq.*;

iv.   Whether Defendants' practices are "illegal" as defined by Cal. *Bus. & Prof. Code* §§ 17200, *et seq.*;

v.   Whether Defendants' practices are "fraudulent" as defined by Cal. *Bus. & Prof. Code* §§ 17200, *et seq.*;

vi.   Whether such practices violate Cal. *Bus. & Prof. Code* §§ 17200, *et seq.*;

vii.   Whether Defendants violated Cal. *Bus. & Prof. Code* §§ 17500, *et seq.*;

viii.   Whether Plaintiffs and Class Members are entitled to restitution under Cal. *Bus. & Prof. Code* § 17200-17203;

ix.   Whether Plaintiffs and Class Members are entitled to declaratory/injunctive relief under Cal. *Bus. & Prof. Code* § 17535;

x.   Whether Plaintiffs and Class Members are entitled to attorneys' fees and costs under Cal. *Code Civ. Proc.* § 1021.5, Nevada, Oregon and/or Texas law; and

xi.   Whether Defendants violated the Oregon Unlawful Trade Practices Act;

xii.   Whether Defendants violated the Nevada Deceptive Trade Practices Act;

xiii.   Whether Defendants violated the Texas Deceptive Trade Practices Act;

xiv.   Whether Plaintiffs and Class Members are entitled to statutory damages.

104.   **Typicality**:  Plaintiffs' claims are typical of the claims of members of the Classes, as Plaintiffs were subject to the same common course of conduct by Defendants as all Class members. The injuries to each member of the Classes were caused directly by Defendants' wrongful conduct as alleged herein.

///

105.   **Adequacy of Representation**:  Plaintiffs will fairly and adequately represent and protect the interests of the Classes. Plaintiffs retained counsel with substantial experience in handling complex class action litigation and litigation against product manufacturers. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Classes, and have financial resources to do so.

106.   **Superiority of Class Action**: A class action is superior to other available methods for the fair and efficient adjudication of the present controversy. Class members have little interest in individually controlling the prosecution of separate actions because the individual damage claims of each Class member are not substantial enough to warrant individual filings. In sum, for many if not most Class members, a class action is the only feasible mechanism that will allow them an opportunity for legal redress and justice. The conduct of this action as a class action in this forum, with respect to some or all of the issues presented herein, presents fewer management difficulties, conserves the resources of the parties and of the court system, and protects the rights of each Class member.

107.   Moreover, individualized litigation would also present the potential for varying, inconsistent, or incompatible standards of conduct for Defendants, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. The adjudication of individual Class members' claims would also, as a practical matter, be dispositive of the interests of other members not parties to the adjudication, and could substantially impair or impede the ability of other Class members to protect their interests.

108.  Plaintiffs and Class members have suffered and will continue to suffer harm as a result of Defendants' unlawful and wrongful conduct. Defendants have acted, or refused to act, on grounds generally applicable to the Classes,

thereby making appropriate final and injunctive relief with regard to the Class members as a whole.

## VII.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT, CAL. *CIV. CODE* §§ 1750, *ET SEQ.***

**(Against All Defendants on Behalf of Plaintiffs Michael Hellman, Francisco Berlanga, and the California Class)**

109.   Plaintiffs hereby incorporate by reference and re-allege each and every allegation set forth in each and every preceding paragraph of this Complaint, as though fully set forth herein.

110.   Hellman and Berlanga bring this cause of action on behalf of themselves and the California Class against all Defendants.

111.   The California Consumers Legal Remedies Act (the "CLRA"), Cal. *Civ. Code* §§ 1770, *et seq.*, was enacted to protect consumers against unfair and deceptive business practices. It creates a non-exclusive statutory remedy for unfair methods of competition and unfair or deceptive acts or business practices. Its self-declared purpose is to protect consumers against these unfair and deceptive business practices, and to provide efficient and economical procedures to secure such protection. Cal. *Civ. Code* § 1760. The CLRA was designed to be liberally construed and applied in favor of consumers to promote its underlying purposes. *Id*. The CLRA applies to Defendants' acts and practices described herein because it extends to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to Plaintiffs and others similarly situated.

112.   The Class Vehicles are a "good" within the meaning of Cal. *Civ. Code* § 1761(a), and the transactions/agreements are "transactions" within the meaning of Cal. *Civ. Code* § 1761(e).

113.   Plaintiffs and California Class Members are "consumers" within the meaning of Cal. *Civ. Code* § 1761(d). Plaintiff and Class Members and Defendants are "persons" within the meaning of Cal. *Civ. Code* § 1761(c).

114.   The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices," including but not limited to:

(a)   Cal. *Civ. Code* § 1770(a)(5) "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have";

(b)   Cal. *Civ. Code* § 1770(a)(7) "Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another";

(c)   Cal. *Civ. Code* § 1770(a)(9) "Advertising goods or service with intent not to sell them as advertised";

(d)   Cal. *Civ. Code* § 1770(a)(13) "Making false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions";

(e)   Cal. *Civ. Code* § 1770(a)(14) "Represent that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law";

(f)   Cal. *Civ. Code* § 1770(a)(16) "Represent that the subject of a transaction has been supplied in accordance with a previous representation when it has not"; and

(g)   Cal. *Civ. Code* § 1770(a)(19) "Inserting an unconscionable provision in the contract.

115.   Any waiver by Plaintiffs and the California Class members of the provisions of the CLRA is contrary to public policy and is unenforceable and void

1  under Cal. *Civ. Code* § 1751.

2      116.   Polaris includes stickers like the following to suggest that their

3  vehicles meet these OSHA requirements:



6      117.   The stickers are placed on Class Vehicles and are visible at the point

7  of sale where consumers are also informed that Class Vehicles meet all applicable

8  standards and regulations, including self-adopted regulations, and meet OSHA

9  requirements of 29 C.F.R. § 1928.53, when in fact, they do not.

10     118.   On or around May 26, 2018, Hellman purchased a 2018 Polaris RZR

11 Turbo S in Tehama County, California.

12     119.   Hellman saw and read the label/sticker on the 2018 Polaris RZR XP

13 similar to the picture listed below:



18     120.   Based on Hellman's employment experience in the HVAC industry,

19 he understood that OSHA requirements were federal regulations pertaining to

20 safety. Hellman read the sticker on the 2018 Polaris RZR Turbo S and understood

21 the language to mean that the vehicle's ROPS structure met federal standards for

22 safety and that the vehicle was safe for use by him, his family, and friends.

23     121.   Hellman, in seeing and reading the sticker, relied on the language

24 contained therein to purchase the 2018 Polaris RZR Turbo S. If the sticker said

25 that the ROPS structure failed to meet OSHA requirements, he would not have

26 purchased the 2018 Polaris RZR Turbo S.

27     122.   Hellman bought a Cage WRX aftermarket ROPS after Polaris

28 recalled certain ROPS. Hellman became aware of how weak Polaris' cages were

1   and did not feel it provided the safety necessary to protect himself and his

2   passengers.

3       123.   In or around May 18, 2019, Berlanga purchased a 2018 Polaris RZR

4   570 EPS in California.

5       124.   Berlanga saw and read the label/stickers on the 2018 Polaris RZR

6   570 EPS as depicted below:



15      125.   Berlanga was originally going to purchase an ATV, not a UTV.

16  However, based on the fact the 2018 Polaris RZR 570 EPS had a roll cage/ROPS

17  and being informed that it met OSHA standards for safety, Berlanga read the

18  sticker on the 2018 Polaris RZR 570 EPS and understood the language to mean

19  that the vehicle's ROPS structure met federal standards for safety and that the

20  vehicle was safe for use by him, his family, and friends.

21      126.   Berlanga, in seeing and reading the sticker, relied on the language

22  contained therein to purchase 2018 Polaris RZR 570 EPS. If the sticker said that

23  the ROPS structure failed to meet OSHA requirements, he would not have

24  purchased the 2018 Polaris RZR 570 EPS.

25      127.   None of the Class Vehicles sold by Polaris meet the OSHA

26  requirements of 29 C.F.R. § 1928.53. Polaris tell all of their customers that their

27  ROPS are safe because they meet this standard. They do not.

28  ///

128.   In failing to provide consumers accurate and truthful information about the true nature and characteristics of the Class Vehicles pertaining to compliance with all applicable federal and state statutes, standards, and regulations, including self-adopted regulations, specifically OSHA requirements of 29 C.F.R. § 1928.53, consumers are damaged based on the benefit of the bargain, that they have to retrofit the Class Vehicles for adequate safety, and are faced with a strong likelihood of serious injury or death.

129.   Pursuant to Cal. *Civ. Code* § 1782, Plaintiffs intend to notify Defendants of the particular violations of Cal. *Civ. Code* § 1770 (the "Notice Letter"). If Defendants fail to comply with Plaintiffs' demands within thirty days of receipt of the Notice Letter, pursuant to Cal. *Civ. Code* § 1782, Plaintiffs will amend this Complaint to request damages and other monetary relief under the CLRA.

## SECOND CAUSE OF ACTION

### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW, CAL. *BUS. & PROF. CODE* §§ 17200, *ET SEQ.*)

**(Against All Defendants on Behalf of Plaintiffs Michael Hellman, Francisco Berlanga, and the California Class)**

130.   Plaintiffs hereby incorporate by reference and re-allege each and every allegation set forth in each and every preceding paragraph of this Complaint, as though fully set forth herein.

131.   Hellman and Berlanga bring this cause of action on behalf of themselves and the California Class against all Defendants.

132.   The California Unfair Competition Law, Cal. *Bus. & Prof. Code* §§ 17200, *et seq*., ("UCL") prohibits any unlawful, unfair or fraudulent business act or practice.

133.   On or around May 26, 2018, Hellman purchased a 2018 Polaris RZR Turbo S in Tehama County, California.

134.   Hellman saw and read the label/sticker on the 2018 Polaris RZR XP similar to the picture listed below:



135.   Based on Hellman's employment experience in the HVAC industry, he understood that OSHA requirements were federal regulations pertaining to safety. Hellman read the sticker on the 2018 Polaris RZR Turbo S and understood the language to mean that the vehicle's ROPS structure met federal standards for safety and that the vehicle was safe for use by him, his family, and friends.

136.   Hellman, in seeing and reading the sticker, relied on the language contained therein to purchase the 2018 Polaris RZR Turbo S. If the sticker said that the ROPS structure failed to meet OSHA requirements, he would not have purchased the 2018 Polaris RZR Turbo S.

137.   Hellman bought a Cage WRX aftermarket ROPS after Polaris recalled certain ROPS. Hellman became aware of how weak Polaris' cages were and did not feel it provided the safety necessary to protect himself and his passengers.

138.   In or around May 18, 2019, Berlanga purchased a 2018 Polaris RZR 570 EPS in California.

139.   Berlanga saw and read the label/stickers on the 2018 Polaris RZR 570 EPS as depicted below:

///

///

140.   Berlanga was originally going to purchase an ATV, not a UTV. However, based on the fact the 2018 Polaris RZR 570 EPS had a roll cage/ROPS and being informed that it met OSHA standards for safety, Berlanga read the sticker on the 2018 Polaris RZR 570 EPS and understood the language to mean that the vehicle's ROPS structure met federal standards for safety and that the vehicle was safe for use by him, his family, and friends.

141.   Berlanga, in seeing and reading the sticker, relied on the language contained therein to purchase 2018 Polaris RZR 570 EPS. If the sticker said that the ROPS structure failed to meet OSHA requirements, he would not have purchased the 2018 Polaris RZR 570 EPS.

*UNLAWFUL*

142.   Defendants committed "unlawful" business acts and practices by engaging in conduct that violates the CLRA, Cal. *Civ. Code* §§ 1770(a)(5), (a)(7), (a)(9), (a)(13), (a)(14) and (a)(19) as well as California's False Advertising Law.

143.   Such conduct is ongoing and continues to this date and violates the unlawful prong of the UCL.

*FRAUDULENT*

144.   In order to prevail under the "fraudulent" prong of the UCL, a consumer must allege that the fraudulent business practice was likely to deceive members of the public.

///

145.   The test for "fraud" as contemplated by Cal. *Bus. & Prof. Code* §§ 17200, *et seq*. is whether the public is likely to be deceived. Unlike common law fraud, a UCL violation can be established even if no one was actually deceived, relied upon the fraudulent practice, or sustained any damage.

146.   Polaris includes nice stickers like the following to suggest that their vehicles meet these OSHA requirements:



147.   The stickers are placed on Class Vehicles and are visible at the point of sale where consumers are also informed that Class Vehicles meet all applicable standards and regulations, including self-adopted regulations, and meet OSHA requirements of 29 C.F.R. § 1928.53, when in fact, they do not.

148.   None of the Class Vehicles sold by Polaris meet the OSHA requirements of 29 C.F.R. § 1928.53. Polaris tell all of their customers that their ROPS systems are safe because they meet this standard. They do not.

149.   Defendants fraudulently informed Plaintiffs and the California Class that the Class Vehicles passed the OSHA 29 C.F.R. § 1928.53 test when Polaris used the inappropriate gross vehicle weight instead of 110 pounds multiplied by either the maximum power take off horsepower of 95% of the net flywheel horsepower, which would be between four and nearly seven times a greater force for the test. This induced Plaintiffs and other class members to purchase the Class Vehicles at inflated prices based on those misrepresentations.

150.   In failing to provide consumers accurate and truthful information about the true nature and characteristics of the Class Vehicles pertaining to compliance with all applicable federal and state statutes, standards, and regulations, including self-adopted regulations, specifically OSHA requirements of 29 C.F.R. § 1928.53, consumers are damaged based on the benefit of the bargain, that they have to retrofit the Class Vehicles for adequate safety, and are

1    faced with a strong likelihood of serious injury or death.

2        151.   Thus, Defendants' conduct has violated the "fraudulent" prong of

3    Cal. *Bus. & Prof. Code* § 17200.

4        152.   Such conduct is ongoing and continues to this date and violates the

5    fraudulent prong of the UCL.

6        153.   On April 6, 2017 in *McGill v. Citibank, N.A.*, 2 Cal.5th 945 (2017),

7    the California Supreme Court ruled that any contract that waives the statutory

8    remedy of public injunctive relief under the Unfair Competition Law, False

9    Advertising Law, and Consumers Legal Remedies Act is contrary to California

10   public policy and this unenforceable under California law. Plaintiffs and the Class

11   seek injunctive relief under the Unfair Competition Law, Cal. *Bus. & Prof. Code*

12   §§ 17200, *et seq.* due to Defendants' violation of the False Advertising Law,

13   Consumer Legal Remedies Act, Breach of Express Warranty, and Breach of

14   Implied Warranty based on Defendants' unlawful, unfair, and fraudulent business

15   practices and misleading advertisements that the Class Vehicles meet all

16   applicable federal and state statutes, standards, regulations, including OSHA

17   requirements of 29 C.F.R § 1928.53. Plaintiffs and the California Class seek to

18   enjoin Defendants' illegal business practices of advertising and informing

19   consumers that the Class Vehicles meet all applicable federal and state statutes,

20   standards, regulations, including OSHA requirements of 29 C.F.R § 1928.53,

21   when they in fact, do not.

22       154.   As such, Plaintiffs and the California Class seek public injunctive

23   relief to prevent Defendants from continuing with their unlawful business acts and

24   practices as alleged herein to ensure that Defendants do not continue to harm the

25   general public by continuing to engage in the unlawful business acts and practices

26   as alleged herein.

27       155.   Plaintiffs, individually, and on behalf of all California consumers,

28   seek individual, representative, and public injunctive relief and any necessary

1    order or judgments that will prevent Defendants from continuing with their

2    unlawful business acts and practices as alleged herein.

3          156.   Plaintiffs seek declaratory relief, restitution and disgorgement of all

4    profits obtained, and public injunctive relief as previously described.

5                           **THIRD CAUSE OF ACTION**

6              **VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW,**

7                 **CAL. *BUS. & PROF. CODE* §§ 17500, *ET SEQ.***

8     **(Against All Defendants on Behalf of Plaintiffs Michael Hellman, Francisco**

9                       **Berlanga, and the California Class)**

10         157.   Plaintiffs hereby incorporate by reference and re-allege each and

11   every allegation set forth in each and every preceding paragraph of this

12   Complaint, as though fully set forth herein.

13         158.   Hellman and Berlanga bring this cause of action on behalf of

14   themselves and the California Class against all Defendants.

15         159.   Pursuant to the California False Advertising Law, Cal. *Bus. & Prof.*

16   *Code* §§ 17500, *et seq*., ("FAL") it is unlawful to engage in advertising "which is

17   untrue or misleading, and which is known, or which by the exercise of reasonable

18   care should be known, to be untrue or misleading."

19         160.   Defendants caused to be made or disseminated through California

20   and the United States, through advertising, marketing and other publications,

21   statements that were untrue or misleading, including statements on the stickers on

22   Class Vehicles and in nationally distributed print and video advertisements that

23   the Class Vehicles were passed the OSHA 29 C.F.R. § 1928.53 test. These

24   statements were known, or which by the exercise of reasonable care should have

25   been known, to Defendants to be untrue and misleading to consumers, including

26   Plaintiffs and the other Class Members.

27         161.   On or around May 26, 2018, Hellman purchased a 2018 Polaris RZR

28   Turbo S in Tehama County, California.

162.   Hellman saw and read the label/sticker on the 2018 Polaris RZR XP similar to the picture listed below:



163.   Based on Hellman's employment experience in the HVAC industry, he understood that OSHA requirements were federal regulations pertaining to safety. Hellman read the sticker on the 2018 Polaris RZR Turbo S and understood the language to mean that the vehicle's ROPS structure met federal standards for safety and that the vehicle was safe for use by him, his family, and friends.

164.   Hellman, in seeing and reading the sticker, relied on the language contained therein to purchase the 2018 Polaris RZR Turbo S. If the sticker said that the ROPS structure failed to meet OSHA requirements, he would not have purchased the 2018 Polaris RZR Turbo S.

165.   Hellman bought a Cage WRX aftermarket ROPS after Polaris recalled certain ROPS. Hellman became aware of how weak Polaris' cages were and did not feel it provided the safety necessary to protect himself and his passengers.

166.   In or around May 18, 2019, Berlanga purchased a 2018 Polaris RZR 570 EPS in California.

167.   Berlanga saw and read the label/stickers on the 2018 Polaris RZR 570 EPS as depicted below:

///

///



168.   Berlanga was originally going to purchase an ATV, not a UTV. However, based on the fact the 2018 Polaris RZR 570 EPS had a roll cage/ROPS and being informed that it met OSHA standards for safety, Berlanga read the sticker on the 2018 Polaris RZR 570 EPS and understood the language to mean that the vehicle's ROPS structure met federal standards for safety and that the vehicle was safe for use by him, his family, and friends.

169.   Berlanga, in seeing and reading the sticker, relied on the language contained therein to purchase 2018 Polaris RZR 570 EPS. If the sticker said that the ROPS structure failed to meet OSHA requirements, he would not have purchased the 2018 Polaris RZR 570 EPS.

170.   Polaris includes nice stickers like the following to suggest that their vehicles meet these OSHA requirements:



171.   The stickers are placed on Class Vehicles and are visible at the point of sale where consumers are also informed that Class Vehicles meet all applicable standards and regulations, including self-adopted regulations, and meet OSHA requirements of 29 C.F.R. § 1928.53, when in fact, they do not.

172.   None of the Class Vehicles sold by Polaris meet the OSHA requirements of 29 C.F.R. § 1928.53. Polaris tell all of their customers that their ROPS systems are safe because they meet this standard. They do not.

173.   In failing to provide consumers accurate and truthful information about the true nature and characteristics of the Class Vehicles pertaining to compliance with all applicable federal and state statutes, standards, and regulations, including self-adopted regulations, specifically OSHA requirements of 29 C.F.R. § 1928.53, consumers are damaged based on the benefit of the bargain, that they have to retrofit the Class Vehicles for adequate safety, and are faced with a strong likelihood of serious injury or death.

174.   As a direct and proximate result of Defendants' misleading and false advertising, Plaintiffs and the other California Class Members have suffered injury in fact and have lost money or property. Plaintiffs reasonably relied upon Defendants' representations regarding the Class Vehicles. In reasonable reliance on Defendants' false advertisements, Plaintiffs and other California Class Members purchased, owned or leased Class Vehicles. In turn, Plaintiffs and other California Class Members were have suffered injury in fact.

175.   The misleading and false advertising described herein presents a continuing threat to Plaintiffs and the California Class Members in that Defendants persist and continue to engage in these practices, and will not cease doing so unless and until forced to do so by this Court. Defendants' conduct will continue to cause irreparable injury to consumers unless enjoined or restrained. Plaintiffs are entitled to preliminary and permanent injunctive relief ordering Defendants to cease their false advertising, as well as disgorgement and restitution to Plaintiffs and all California Class Members, Defendants' revenues associated with their false advertising, or such portion of those revenues as the Court may find equitable.

///

///

///

///

1

## **FOURTH CAUSE OF ACTION**

2

**VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT,**

3

**OR. REV. STAT. §§ 646.605, *ET SEQ.***

4

**(Against All Defendants on Behalf of Plaintiff Tim Artoff and**

5

**the Oregon Class)**

6       176.   Plaintiffs hereby incorporate by reference and re-allege each and

7   every allegation set forth in each and every preceding paragraph of this

8   Complaint, as though fully set forth herein.

9       177.   Artoff brings this cause of action on behalf of himself and the

10  Oregon Class against all Defendants.

11      178.   Polaris, Artoff and the Oregon Class are "persons" within the

12  meaning of Or. Rev. Stat. § 646.605(4).

13      179.   Polaris is engaged in "trade" or "commerce" within the meaning of

14  Or. Rev. Stat. § 646.605(8).

15      180.   The Oregon Unfair Trade Practices Act ("Oregon UTPA") prohibits

16  unfair or deceptive acts conducted in trade or commerce including but not limited

17  to:

18      •   Or. Rev. Stat. § 646.608(1)(b) "Causes likelihood of confusion or of

19          misunderstandings as to the source, sponsorship, approval, or

20          certification of real estate, goods or services";

21      •   Or. Rev. Stat. § 646.608(1)(c) "Causes likelihood of confusion or of

22          misunderstandings as to affiliation, connection, or association with,

23          or certification by, another";

24      •   Or. Rev. Stat. § 646.608(1)(e) "Representing that real estate, goods

25          or services have sponsorship, approval, characteristics, ingredients,

26          uses, benefits, quantities or qualities that the real estate, goods or

27          services do not have…";

28  ///

---

- Or. Rev. Stat. § 646.608(1)(g) "Representing that real estate, goods or services are of a particular standard, quality, or grade, or that real estate or goods are of a particular style or model, if the real estate, goods or services are of another. have sponsorship, approval, characteristics, ingredients, uses, benefits, quantities or qualities that the real estate, goods or services do not have…";

- Or. Rev. Stat. § 646.608(1)(i) "Advertises real estate, good or services with intent not to provide the real estate, goods or services as advertised..." and

- Or. Rev. Stat. § 646.608(1)(u) "Engages in any other unfair or deceptive conduct in trade or commerce";

181.   Polaris is engaged in "trade" or "commerce" within the meaning of Or. Rev. Stat. § 646.605(8).

182.   In 2021, Artoff purchased a 2021 RZR Turbo S Velocity in Oregon.

183.   Artoff saw and read the label/sticker on the 2021 RZR Turbo S Velocity pictured below:



184.   Based on Artoff's employment experience as a peace officer, he understood that OSHA requirements were federal regulations pertaining to safety. Artoff read the sticker on the 2021 RZR Turbo S Velocity and understood the language to mean that the vehicle's ROPS structure met federal standards for safety and that the vehicle was safe for use by him, his family, and friends.

185.   Artoff, in seeing and reading the sticker, relied on the language contained therein to purchase the 2021 RZR Turbo S Velocity. If the sticker said that the ROPS structure failed to meet OSHA requirements, he would not have purchased the 2021 RZR Turbo S Velocity.

186.   None of the Class Vehicles sold by Polaris meet the OSHA requirements of 29 C.F.R. § 1928.53. Polaris tell all of their customers that their ROPS systems are safe because they meet this standard. They do not.

187.   In failing to provide consumers accurate and truthful information about the true nature and characteristics of the Class Vehicles pertaining to compliance with all applicable federal and state statutes, standards, and regulations, including self-adopted regulations, specifically OSHA requirements of 29 C.F.R. § 1928.53, consumers are damaged based on the benefit of the bargain, that they have to retrofit the Class Vehicles for adequate safety, and are faced with a strong likelihood of serious injury or death.

188.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Artoff and Oregon Class members, about the true characteristics of the strength of the ROPS meant to protect passengers, as well as the true value of the Class Vehicles.

189.   Plaintiffs and Oregon Class members suffered ascertainable loss and actual damages as a direct and proximate result of Polaris' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the Oregon Class members who purchased the Class Vehicles would not have purchased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as diminished loss. Plaintiff and the Oregon Class members did not obtain the benefit of the bargain from Polaris.

190.   Polaris had a duty to refrain from unfair and deceptive practices under the Oregon UTPA in the course of business.

191.   Polaris' violations present a continuing risk to Artoff, the Oregon Class members and the general public. Polaris' unlawful acts and practices complained of herein affect the public interest.

192.   Pursuant to Or. Rev. Stat. § 646.638, Artoff and the Oregon Class members seek an order enjoining Polaris' unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Oregon UTPA.

### FIFTH CAUSE OF ACTION

**VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT,**

**NEV. *REV STAT.* §§ 598.0903, *ET SEQ.***

**(Against All Defendants on Behalf of Plaintiff Cy Mitchell and the Nevada Class)**

193.   Plaintiffs hereby incorporate by reference and re-allege each and every allegation set forth in each and every preceding paragraph of this Complaint, as though fully set forth herein.

194.   Mitchell brings this cause of action on behalf of himself and the Nevada Class against all Defendants.

195.   Nev. Rev. State (NRS) 41.600(1) states that an action may be brought by any person who is a victim of consumer fraud.

196.   NRS 41.600(2) defines "consumer fraud" as a "deceptive trade practice" as defined in NRS 598.0915 to NRS 598.0925.

197.   The Nevada Deceptive Trade Practices Act ("Nevada DTPA"). NRS § 598.0915 provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person: "5. Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith"; "7. Represents that goods or services for sale or lease are of a particular standard,

quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model"; "9. Advertises goods or services with intent not to sell or lease them as advertised"; or "15. Knowingly makes any other false representation in a transaction.

198.   Polaris knowingly violated NRS 598.0915(13) by making false or misleading statements regarding the safety of the Class Vehicles.

199.   Polaris engaged in consumer fraud when it violated NRS 598.0915 by knowingly making false representations by representing to consumers that their manufactured and sold Class Vehicles complied with the OSHA requirements of 29 C.F.R. 1928.53, when in fact they did not.

200.   In 2019, Mitchell purchased a 2019 RZR XP Turbo new in Nevada.

201.   Mitchell saw and read the label/sticker on the 2019 RZR XP Turbo similar to the picture listed below:



202.   Mitchell understood that OSHA requirements were federal regulations pertaining to safety. Mitchell read the sticker on the 2019 RZR XP Turbo and understood the language to mean that the vehicle's ROPS structure met federal standards for safety and that the vehicle was safe for use by him, his family, and friends.

203.   Mitchell, in seeing and reading the sticker, relied on the language contained therein to purchase the 2019 RZR XP Turbo. If the sticker said that the ROPS structure failed to meet OSHA requirements, he would not have purchased the 2019 RZR XP Turbo.

///

204. Mitchell had a roll over and the cage collapsed due to it being weak and unsafe for consumers.

205. Polaris intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Mitchell and the Nevada Class.

206. Polaris knew or should have known its conduct violated the Nevada DTPA.

207. In the course of their business, Polaris misrepresented, concealed and suppressed material facts about the Class Vehicles and the actual strength of the ROPS meant to protect consumers.

208. Defendants thus violated the Act by, at minimum: knowingly representing that Class Vehicles have uses and benefits which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not; and knowingly making other false representations in a transaction.

209. Polaris' actions as set forth above occurred in the conduct of trade or commerce.

210. Mitchell and the Nevada Class members suffered ascertainable loss and actual damages as a direct and proximate result of Polaris' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the Oregon Class members who purchased the Class Vehicles would not have purchased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as diminished loss. Plaintiff and the Oregon Class members did not obtain the benefit of the bargain from Polaris.

211.   Accordingly, Mitchell and the Nevada Class seek their actual damages, punitive damages, an order enjoining Polaris' deceptive acts or practices, costs of Court, attorney's fees, and all other appropriate and available under the Nevada DTPA.

## SIXTH CAUSE OF ACTION

**VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT,**

**TEX. *Bus. & Com. Code* §§ 17.46, *et seq.***

**(Against All Defendants on Behalf of Plaintiff Jonathan Lollar and the Texas Class)**

212.   Plaintiffs hereby incorporate by reference and re-allege each and every allegation set forth in each and every preceding paragraph of this Complaint, as though fully set forth herein.

213.   Polaris' conduct concerning the testing of its ROPS systems and labelling the vehicles which it intended to induce Plaintiff and Class Members with false information prior to purchase is unconscionable under the DTPA.

214.   The DTPA makes unlawful any "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce […]" Tex. *Bus. & Com. Code* § 17.46. A plaintiff may maintain an action under the DTPA where: (1) he is a consumer; (2) the defendant engaged in a false, misleading, or deceptive act; and (3) the act constituted a producing cause of the plaintiff's damages. *See id.* § 17.50(a); *see also Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 478 (Tex. 1995).

215.   Lollar and Class Members are "consumers" within the meaning of the DTPA. Within the relevant period, Plaintiff and Class Members each purchased at least one of Polaris' Class Vehicles.

216.  Polaris engaged in "false, misleading, or deceptive acts" within the meaning of the DTPA.

///

217.   The DTPA prohibits "unfair methods of competition and unfair or deceptive acts or practices," including but not limited to:

- Tex. *Bus. & Com. Code* § 17.46(b)(2): "causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services";

- Tex. *Bus. & Com. Code* § 17.46(b)(5): "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not";

- Tex. *Bus. & Com. Code* § 17.46(b)(7): "representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another";

- Tex. *Bus. & Com. Code* § 17.46(b)(13): "knowingly making false or misleading statements of fact concerning the need for parts, replacement, or repair service";

- Tex. *Bus. & Com. Code* § 17.46(b)(22): "representing that work or services have been performed on, or parts replaced in, goods when the work or services were not performed or the parts replaced"; and

- Tex. *Bus. & Com. Code* § 17.46(b)(24): "failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed[.]"

///

///

///

218.  Polaris includes nice stickers like the following to suggest that their vehicles meet these OSHA requirements:



219.  The stickers are placed on Class Vehicles and are visible at the point of sale where consumers are also informed that Class Vehicles meet all applicable standards and regulations, including self-adopted regulations, and meet OSHA requirements of 29 C.F.R. § 1928.53, when in fact, they do not.

220.  Polaris' false, misleading, and/or deceptive acts constituted a producing cause of Lollar and the Class Members' damages within the meaning of the DTPA.

221.  In or around December 19, 2020, Lollar purchased a 2021 Polaris RZR XP 4 Turbo in Texas. Lollar saw and read the stickers on the 2021 Polaris RZR XP 4 Turbo which contained the sticker at the time of sale as depicted below, suggesting that their vehicles meet these OSHA requirements:



222.  Lollar read the sticker on the 2021 Polaris RZR XP 4 Turbo and understood the language to mean that the vehicle's ROPS structure met federal standards for safety and that the vehicle was safe for use by him, his family, and friends.

223.  Lollar, in seeing and reading the sticker, relied on the language contained therein to purchase the 2021 Polaris RZR XP 4 Turbo. If the sticker said that the ROPS structure failed to meet OSHA requirements, he would not have purchased the 2021 Polaris RZR XP 4 Turbo.

224.  None of the Class Vehicles sold by Polaris meet the OSHA requirements of 29 C.F.R. § 1928.53. Polaris tells all of their customers that their ROPS are safe because they meet this standard. They do not.

225.  Polaris also used a load distributor when conducting the tests at the already artificially low "weight." This caused the load to not be applied directly to the portion of the ROPS being measured, but to be spread across a greater mass/area. As a result, even the Weight using the Gross Vehicle Weight" was not applied correctly to the ROPS frame.

226.  In failing to provide consumers accurate and truthful information about the true nature and characteristics of the Class Vehicles pertaining to compliance with all applicable federal and state statutes, standards, and regulations, including self-adopted regulations, specifically OSHA requirements of 29 C.F.R. § 1928.53, consumers are damaged based on the benefit of the bargain, that they have to retrofit the Class Vehicles for adequate safety, and are faced with a strong likelihood of serious injury or death.

227.  Polaris' conduct concerning the testing of its ROPS and labelling the vehicles which it intended to induce Lollar and Class Members with false information prior to purchase is unconscionable under the DTPA.

228.  Lollar and Texas Class Members have been damaged by Polaris' violation of the DTPA and are entitled to relief.

229.  Lollar brings this cause of action on behalf of himself and the Texas Class against all Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class, pray for relief and judgment as follows:

1.  Certifying the Classes as requested herein;

2.  Providing such further relief as may be just and proper.

3.  Appointing Plaintiffs and their counsel to represent the Classes;

In addition, Plaintiffs, and the Class Members pray for further judgment as follows:

4.  Restitution of the funds improperly obtained by Defendants;

5. All compensatory or special damages;

6. Any and all statutory enhanced damages;

7. All reasonable and necessary attorneys' fees and costs provided by statute, common law or the Court's inherent power;

8. For equitable and injunctive relief, including public injunctive relief; and

9. Any and all other relief that this Court deems just and proper.

Dated:  May 25, 2021                    Respectfully submitted,

                                        By: *s/ John P. Kristensen*

                                        John P. Kristensen (SBN 224132)
                                        **KRISTENSEN LLP**

                                        Todd M. Friedman, Esq. (SBN 216752)
                                        **LAW OFFICES OF TODD M. FRIEDMAN, P.C.**

                                        Christopher W. Wood (SBN 193955)
                                        **DREYER BABICH BUCCOLA WOOD CAMPORA, LLP**

                                        ***Attorneys for Plaintiffs and all others similarly situated***

1

## **DEMAND FOR JURY TRIAL**

2    Plaintiffs hereby demand a trial by jury for all such triable claims.

3

4    Dated:  May 25, 2021                    Respectfully submitted,

5                                        By:  */s/ John P. Kristensen*

6
                                             John P. Kristensen (SBN 224132)
7                                            **KRISTENSEN LLP**

8
                                             Todd M. Friedman, Esq. (SBN 216752)
9                                            **LAW OFFICES OF TODD M. FRIEDMAN, P.C.**

10
                                             Christopher W. Wood (SBN 193955)
11                                           **DREYER BABICH BUCCOLA WOOD**
                                             **CAMPORA, LLP**
12

13                                           ***Attorneys for Plaintiffs and all others***
                                             ***similarly situated***
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DocuSign Envelope ID: B783FC9E-7485-4AEC-850E-EEFB4971567E

## DECLARATION OF MICHAEL HELLMAN

I, Michael Hellman, declare that if called as a witness, I could and would competently testify to the following facts:

1.    I submit this declaration pursuant to Section 1780(d) of the California Consumer Legal Remedies Act. I have personal knowledge of the matters set forth below and as a witness, I could and would be competent to testify thereto.

2.    It is my understanding that defendants Polaris Industries, Inc, a Delaware Corporation, Polaris Sales, Inc., a Minnesota Corporation, and Polaris Industries, Inc., a Minnesota Corporation conduct regular and sustained business in Tehama County, California.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this declaration was executed on _____5/25/2021_____ in California.

DocuSigned by:

*Michael Hellman*

ACF5974F3AF8491...

Michael Hellman